(No. 6158. April 27, 1935.)

MARIE HENDERSON, Appellant, v. TWIN FALLS COUNTY, Respondent.

[50 Pac. (2d) 597.]

Chapman & Chapman, for Appellant.

J. W. Porter and O. W. Witham, for Respondent.

HOLDEN, J.—In 1921 it was enacted by the Legislature of the State of Idaho as follows:

Sec. 30-3301 (I. C. A.).—"The boards of county commissioners in their respective counties shall have the jurisdiction and power under such limitations and restrictions as are prescribed by law, to provide for the care and maintenance of the indigent sick or otherwise dependent poor of the county; to erect, purchase, lease or otherwise acquire, and to officer and maintain hospitals, hospital grounds and equipment therefor; to levy the necessary tax therefor per capita, not exceeding $2.00 on all persons subject to poll tax in the county, and

also an ad valorem tax not exceeding one-fourth of one per cent on all the taxable property of the county, or either such per capita or ad valorem tax, as may be required."

Sec. 30–3302 (I. C. A.).—"The county commissioners may, when they deem the welfare of their respective counties requires it, and when petitioned thereto by a number of resident taxpayers of their respective counties equal to thirty per cent of the number of persons voting for the secretary of the state of Idaho, at the election next preceding the date of such petition, submit to the qualified electors of said county at any general election the proposition of issuing coupon bonds of the county for the purpose of providing such hospital, hospital grounds and equipment, and when authorized thereto by two-thirds vote at such election, shall issue and sell such coupon bonds and use the proceeds therefrom for providing such hospital grounds, buildings and equipment. The board may by a resolution adopted at a regular, or at any special, meeting called for that purpose, call a special election for such purpose, or submit at any general election, the question of issuing negotiable coupon bonds for an amount deemed necessary for the aforesaid purposes.

"The board shall be governed in calling and holding such election and in the issuance and sale of such bonds, and in the providing for the payment of the interest thereon, and for their redemption by the provisions of section 30–1401 to 30–1409, inclusive, of the Idaho Code."

Sec. 30–3303 (I. C. A.).—"Such hospital may suitably provide for, and accept other patients in so far as their facilities will permit and may charge and accept payments from such of their patients as are able to make payments for services rendered and care given. The board of county commissioners may make suitable rules and regulations for the management and operation of such hospital property by a suitable board of control, or otherwise, or for carrying out such hospital uses and purposes under a lease of the same.

"The boards, officers or lessees of such hospital property shall render accounts and reports, to the county commissioners as may be required by the board; and shall render accounts and deliver over any and all moneys received by them for the

county, to the county treasurer in such manner as provided by law for the handling of funds of this kind.''

Following the enactment of the statute, the qualified electors of respondent county, by a two-thirds vote, voted bonds for the purchase of hospital grounds and the erection, maintenance, equipment and operation of a county hospital, as provided by statute. Since the erection and equipment of the hospital, it has been operated for the profit of the respondent, and, further, the greater proportion of the patients have been pay patients.

April 14, 1933, plaintiff and appellant, Marie Henderson, entered the hospital for an operation for appendicitis, as a pay patient. She was operated on April 15, 1933. Following the operation, her physician prescribed an injection in excess of a quart of normal saline solution, directing that the injection be given by a special nurse in attendance upon appellant. Pursuant to the prescription, and the directions of appellant's physician, the special nurse went to the room in the hospital where medicines were kept for and dispensed to the patients of the respondent, and requested the employee of respondent, in charge of and dispensing medicines, to supply her with the saline solution so prescribed by appellant's physician. The employee, in charge of the said room, and whose duty it was to so dispense medicines, gave appellant's special nurse a container, unlabeled, containing a liquid similar in appearance to normal saline solution, but which actually contained boric acid. Appellant's nurse injected the boric acid into the sides and thighs of the appellant. At the points of injection in her thighs, the flesh sloughed off, causing large sores and leaving scars. And, while in the hospital, she contracted typhoid fever, due, it is alleged, to her diminished powers of resistance, caused by the injection of the boric acid, and the resultant sloughing of flesh, and pain and suffering.

August 2, 1933, appellant presented a claim for damages to the respondent. August 4, 1933, appellant commenced this action against respondent to recover damages. October 14, 1933, respondent rejected appellant's claim. October 31, 1933, appellant filed a supplemental complaint, to which respondent interposed a general demurrer. January 12, 1934,

the trial court sustained the general demurrer. April 23, 1934, a judgment of dismissal was entered, from which an appeal was prosecuted to this court.

The complaint is bottomed upon the negligence of the employees of the respondent in the operation of its hospital. Respondent, by its general demurrer, admits the truth of all the material facts alleged in the complaint, as well as all inferences which can be reasonably drawn from such facts. (*Blackwell v. Kercheval*, 27 Ida. 537, 149 Pac. 1060; *Ashley v. Richard*, 32 Ida. 551, 185 Pac. 1067.) So that but a single question is presented on this appeal: Is the respondent answerable to appellant for the damages she suffered on account of the negligence of respondent's employees, in the operation of its hospital?

It is a case of first impression in this state, and presents a most important question, about which there is much diversity of judicial opinion.

Sovereign irresponsibility for official torts rests upon the doctrine that the "King can do no wrong." That doctrine, entrenched in the early common law of England, and adopted in the United States, notwithstanding our admitted difference from the political organization and theory of government which gave it birth, long stood in the way of the individual seeking redress from nation, state, county or city, for injuries sustained by him through the torts of officers. The unfortunate victim of an official tort-feasor was compelled to bear any loss or damage sustained by reason of the negligent discharge of public duties. However, says Edwin M. Borchard, Hotchkiss Professor of Law, Yale University, in an article in the December, 1934, issue of the American Bar Association Journal, entitled, "State and Municipal Liability in Tort— Proposed Statutory Reform," "The judicial door to community liability was first opened through the instrumentality of the municipal corporation. Partly because of the more limited size of the entity, partly because of the fact of incorporation, partly because of the more commercial nature of some of its enterprises, the halo of sovereignty proved vulnerable to juristic persuasion and theories were found upon

which to assert community liability for functions deemed 'proprietary' or 'corporate.' '' Many courts have made a distinction between ''governmental'' and ''proprietary'' or ''corporate'' acts, classifying torts and liability on that basis, while also making a distinction between state, county and city liability, resulting in strange and curious anomalies. For example, says Professor Borchard: In Tennessee, if a pedestrian falls into a hole in a road located on the city line, he may recover if he fell in on the city side, but not if he fell in on the county side; in other cases, recovery by one falling into an unguarded excavation depends upon what department of the city was at fault, or the purpose for which the particular improvement was undertaken, whether for parks, water supply or street repair; if one is killed by contact with a defective municipal wire, the widow's recovery may depend upon whether the wire was used for street lighting, or for domestic supply of electricity; if one slips on a defectively lighted stairway in a public building, used in part for income from rents, recovery may depend on the purpose for which one entered the building; a fire apparatus bound to a fire has been deemed ''governmental,'' the same apparatus returning has been classified as ''corporate''; the *maintenance* of a bridge has been deemed ''corporate,'' but as to travelers on the bridge, it was ''governmental''; and sprinkling streets has been deemed ''governmental,'' but flushing them, ''corporate.''

With the steady advance of cities into fields of private enterprise, there has moved apace a growing, responsible public opinion, insisting that the barriers of immunity of the municipality for its torts be lowered, and the barriers are being lowered as the law progresses.

At this point it is worthy of note that the federal government is operating a great ship canal, a railroad in Alaska, and competing with express companies, and, further, that bills to make the federal government responsible for the negligence or wrongful acts or omissions of its officers or employees were introduced in both Houses of the 69th Congress by the respective chairmen of the Claims Committee, and, while the

bills did not finally pass, the fact that they were introduced by the respective chairmen of the Claims Committee, and that the Bill introduced in the House was passed by the House, and that the Bill introduced in the Senate was passed in the Senate, clearly indicate that it is but a question of a relatively short time until the immunity of the federal government for the negligence of its officers and employees, resting upon the doctrine that the "King can do no wrong," will be largely removed by act of Congress.

It is also noteworthy, in passing, that the State of Idaho has just taken an important step into the field of private enterprise. The state will at once engage in the business of selling intoxicating liquors, for profit, from state owned and operated "stores." Having thus engaged in private enterprise, legislation may shortly follow expressly lowering the barriers to state liability, and making the state responsible for the negligence or wrongful acts of its officers and employees in the conduct of that enterprise, in harmony with the modern trend of legislation and judicial opinion.

The immunity of state governments for the negligence of their officers and employees also rests upon the early English common law doctrine, as above stated, adopted in the United States, that the "King can do no wrong." And the immunity counties and cities likewise enjoy rests upon that doctrine. As to towns and cities, it is generally held that they possess a double character: The one governmental, legislative, or public; the other, in a sense, proprietary or private. (1 Dillon's Mun. Corp., 5th ed., p. 181; *Strickfaden v. Green Creek Highway Dist.*, 42 Ida. 738, 248 Pac. 458, 49 A. L. R. 1057.) And in its capacity as a private corporation, a municipality stands on the same footing as would an individual or body of persons upon whom a like special franchise had been conferred. (*Strickfaden v. Green Creek Highway Dist., supra.*) The advance of counties into fields of private enterprise did not commence as early and has not progressed as rapidly as that of the cities, so that the liability of a county for its torts in private enterprise has not become so well settled. However, it was somewhat recently held by the

Supreme Court of Pennsylvania in *Bell v. City of Pittsburgh*, 297 Pa. 185, 146 Atl. 567, 64 A. L. R. 1542, that a county is liable for the negligence of its employees in operating an elevator in a city and county building, jointly owned, maintained and operated by the county and the city of Pittsburgh, partly for business and partly for governmental purposes, although the person injured was on the way to the office of a governmental department of the city, and that a county which engages in activities not of a governmental nature is liable for the torts of the employees therein. (See, also, *Cleveland v. Town of Lancaster et al.*, 239 App. Div. 263, 267 N. Y. Supp. 673.)

It is contended by respondent that it is a charitable institution, in that it cares for the indigent sick, and, therefore, that it is not liable for the negligence of its employees. In *Geiger v. Simpson Methodist-Episcopal Church*, 174 Minn. 389, 219 N. W. 463, 62 A. L. R. 716, the Supreme Court of Minnesota, discussing the question of the exemption of charitable institutions from liability for the negligence of their officers and servants, says that ''we find a great diversity of reasoning and adjudication in the numerous decisions in various states. One line of cases holds that these organizations are wholly exempt from liability for such negligence. Another line of cases, apparently the greater in number, holds that these organizations are exempt from such liability to persons who are recipients of their charity or service, who are beneficiaries of the work carried on by the organization. Many of these cases hold that the organization is liable to third persons, who are not beneficiaries, and to its own hired servants and employees on the same basis as private individuals and business corporations. Some cases hold that hospitals and colleges are liable to patients or students who pay full consideration for their treatment or tuition. Others hold that the fact that payment is so received does not make them liable. In many cases it is stated that such institutions may be held liable for failure to exercise proper care in the selection of officers and servants, and may be held liable for negligently employing incompetent officers and servants, when

injury results therefrom. Different courts give different reasons for the exemption from liability. The following reasons have been given: That the funds of such institutions are held in trust for specific charitable purposes, and should not be diverted to pay damages for negligence; that the better public policy is to hold them exempt; that they serve the same purpose as governmental agencies, and should come under the same rule; that one who accepts benefits by becoming a patient, student or beneficiary of the institution, impliedly consents to hold it exempt or to waive any claim for negligence of its servants; that the doctrine of *respondeat superior* does not apply to them; that their employees are not, in a legal sense, servants of the organization. Other grounds of exemption have been suggested. All of these reasons have been more or less criticised." Numerous cases involving the question of the tort liability of charitable institutions are collected and analyzed in: *Roosen v. Peter Bent Brigham Hospital,* 235 Mass. 66, 126 N. E. 392, 14 A. L. R. 563, 572; *Love v. Nashville Agricultural & Normal Institute,* 146 Tenn. 550, 243 S. W. 304, 23 A. L. R. 887; *Taylor v. Flower Deaconess Home & Hospital,* 104 Ohio St. 61, 135 N. E. 287, 23 A. L. R. 900; *Weston v. Hospital of St. Vincent,* 131 Va. 587, 107 S. E. 785, 23 A. L. R. 907, 923; *Bachman v. Young Women's Christian Assn.,* 179 Wis. 178, 191 N. W. 751, 30 A. L. R. 448, 455; *St. Vincent's Hospital v. Stine,* 195 Ind. 350, 144 N. E. 537, 33 A. L. R. 1361, 1369; *Hamburger v. Cornell Univ.,* 240 N. Y. 328, 148 N. E. 539, 42 A. L. R. 955; *St. Mary's Academy v. Solomen,* 77 Colo. 463, 238 Pac. 22, 42 A. L. R. 964; *Roberts v. Ohio Valley General Hospital,* 98 W. Va. 476, 127 S. E. 318, 42 A. L. R. 968; *Williams v. Church Home,* 223 Ky. 355, 3 S. W. (2d) 753, 62 A. L. R. 721, 724; *Greatrex v. Evangelical Deaconess Hospital,* 261 Mich. 327, 246 N. W. 137, 86 A. L. R. 487, 491.

It is further contended by respondent that, being a charitable institution, engaged in caring for the indigent sick, the fact that appellant was a pay patient does not subject it to liability for the negligence of its employees. In the well-considered case of *Tucker v. Mobile Infirmary Assn.,* 191 Ala.

572, 68 So. 4, L. R. A. 1915D, 1167, where the authorities are fully and carefully reviewed and analyzed, it was held that a pay patient in a hospital conducted without profit, in which indigent patients were treated without cost, the fees exacted from patients able to pay being used to promote the work, could recover damages for an injury done him through the negligence of an attending nurse. And in *Mulliner v. Evangelischer Diakonniessenverein of Minnesota Dist. of German Evangelical Synod of North America,* 144 Minn. 392, 175 N. W. 699, where the hospital operated by that institution was founded, and the buildings erected, partly by money donated and partly by money borrowed, the hospital not being operated for profit, but most of its patients being pay patients, it was held that the institution was liable in damages for the death of a pneumonia patient who, while suffering from delirium, was left alone in a second story room, jumped out of an open window and was killed. (See, also, *Cohen v. General Hospital Soc. of Connecticut,* 113 Conn. 188, 154 Atl. 435.)

Respondent says that ''if it should be conceded for the sake of argument that the rules governing the liability of municipal corporations apply to counties, then the liability of the respondent would turn upon the question of whether or not the maintenance of the hospital is a governmental function or a proprietary one. We presume that it will be conceded, with-, out citation of authority, that a municipal corporation is not liable for the torts of its employees when acting in a governmental capacity,'' and contends ''that a county is a governmental agency of the state, and is exempt from suits just as the state is exempt,'' upon the same principle and for the same reason that exempts the state, citing *Strickfaden v. Green Creek Highway Dist.,* 42 Ida. 738, 248 Pac. 456, 49 A. L. R. 1057.

This court, in the Strickfaden case, said that ''Counties may be said to be true public corporations. They are local organizations which for the purposes of civil administration are invested with a few functions characteristic of a corporate existence. They are legal political subdivisions of the state, created or superimposed by the sovereign power of the state

of its own sovereign will, without any particular solicitation or consent of the people within the territory affected.'' And that ''Cities, towns and villages may be classified as true municipal corporations, voluntarily organized under the general law at the request and with the concurrent consent of their members, and, in addition to the exercise of the functions of self-government, transact matters of a *quasi* private or business character not governmental in their nature, but rather proprietary, or for the acquisition of private gain for the municipality and its citizens.'' And, further, ''It is well settled that, in the absence of an express statute to that effect, the state is not liable for damages either for nonperformance of its powers or for their improper exercise by those charged with their execution. Counties are generally likewise relieved from liability, for the same reason. They are involuntary subdivisions or arms of the state through which the state operates for convenience in the performance of its functions. In other words, the county is merely an agent of the state, and, since the state cannot be sued without its consent, neither may the agent be sued.''

An examination of the Strickfaden case will disclose that the liability of a county for the negligence of its employees while acting in its private and corporate capacity, under a statute authorizing it to so act, was not before the court. However, it will be observed, this court, in saying that counties are not liable, in the absence of express statute, clearly recognized the liability of a county if it acts under the authority of an express statute.

And in support of its contention ''that a county is a governmental agency of the state, and is exempt from suits just as the state is exempt,'' the respondent also cites *Boise Development Co., Ltd., v. Boise City*, 30 Ida. 675, 167 Pac. 1032. In that case this court defined governmental functions to be ''legal duties imposed by the state upon its creature, and are necessarily mandatory or peremptory,'' and held, in effect, that in order for a municipality to avail itself of the defense that its tort, committed while acting within the scope of its authority, was the result of the exercise of a governmental

function, it must appear that such function was the exercise of a legal duty imposed by the state, which it might not omit with impunity but must perform at its peril, and this court also held that "the mere grant to the city of power or authority to maintain a public park enjoins no absolute duty upon the city to do so, but merely confers the privilege by extending the lawful corporate authority of the city in such case."

We come, then, to the specific question presented here: Does the statute, *supra*, impose an absolute, mandatory duty upon respondent to construct or operate a hospital?

Section 30–3301, *supra*, gives boards of county commissioners power to provide for the care of the indigent sick, and to that end "to erect, purchase, lease, or otherwise acquire, and to officer and maintain hospitals, hospital grounds and equipment therefor."

Section 30–3302, *supra*, provides that boards may, "when they deem the welfare of their respective counties requires it, and when petitioned thereto by a number of resident taxpayers of their respective counties equal to thirty percent of the number of persons voting for the secretary of the state of Idaho, at the election next preceding the date of such petition, submit to the qualified electors of said county at any general election the proposition of issuing coupon bonds of the county for the purpose of providing such hospital. . . . . It is further provided by that section that "the board *may* (emphasis ours), by a resolution adopted at a regular, or at any special, meeting called for that purpose, call a special election for such purpose, or submit at any general election, the question of issuing negotiable coupon bonds for an amount deemed necessary for the aforesaid purpose."

Section 30–3303, *supra*, covers the management and operation of the hospital, it being expressly provided that "such hospital may suitably provide for, and accept other patients in so far as their facilities will permit and may charge and accept payments from such of their patients as are able to make payments for services rendered and care given." It is further provided that boards of commissioners may make suitable rules and regulations for the management and opera-

tion of the hospital by a suitable board of control, or otherwise.

■ The statute merely provides that county commissioners *shall have power* to erect, or to lease, equip and operate a county hospital. A board *may* itself, in the exercise of the power so conferred upon it by the statute, by means of a resolution, submit the matter of the issuance of hospital bonds to the qualified electors of the county, at a general or special election, or the board may submit the matter upon the petition of a fixed percentage of resident taxpayers. The language of the statute is that *"the board may,"* not that the board *must*. And whether, in any given case, a hospital shall be constructed and operated pursuant to proceedings instituted by either a petition of taxpayers, or resolution of a board, submitting the matter of the issuance of bonds, *depends*, not upon any *power* vested in boards by the statute, or even upon the *will* of boards, but upon the vote and consent of two-thirds of the qualified electors voting at a bond election. It is clear, therefore, that by the enactment of the statute in question, the legislature did not intend to impose a mandatory duty upon boards of county commissioners to establish and operate county hospitals. The provisions of the statute for the submission of the matter of the issuance of "hospital bonds" to the electors of the counties for the purpose of acquiring, equipping and operating a hospital, as above pointed out, emphatically negative any intention on the part of the legislature to impose a mandatory duty upon county commissioners to provide hospitalization.

■ The contention that the statute in question here imposes a mandatory duty upon respondent to maintain and operate a hospital is clearly untenable. The record before us shows that respondent voluntarily erected and operates its hospital, with the consent of two-thirds of the taxpayers of Twin Falls County, voting and expressed at a bond election, which constitutes an unusually large number of the most responsible, as well as representative, citizens of a county. Whether any step whatever is taken to establish and operate a hospital, either by petition, or otherwise, is subject to the

discretion of boards of county commissioners. A board may act to establish and operate a hospital, or it may refuse to do so, as it deems best. It is not a governmental duty, within the rule announced in *Boise Development Co. v. Boise City, supra,* because it is not made an absolute, mandatory duty. The mere grant to a county of authority to maintain and operate a hospital enjoins no absolute duty to do so. (*Boise Development Co. v. Boise City, supra.*) It must be remembered that respondent admits, by its general demurrer, that it is operating its hospital for profit, and that the greater proportion of its patients are pay patients. We conclude that in supplying hospital care to the appellant, respondent was acting in a proprietary and corporate capacity, and, therefore, is liable to her for the negligence of its hospital employees.

It follows that the judgment of dismissal must be reversed, and it is so ordered. Costs to appellant.

Morgan and Ailshie, JJ., concur.

Givens, C. J., and Budge, J., dissent.

### ON REHEARING.

#### (November 2, 1935.)

AILSHIE, J.—After the original opinion was filed herein a petition for rehearing was filed and we were furnished with a very exhaustive brief and argument by the attorneys for respondent, dealing with new questions not presented by respondent on the original hearing. The earnestness with which counsel presented the matter led us to grant a rehearing and the case was reargued at the September term. We have again given the case very careful consideration and have examined a great many and variety of authorities bearing on the questions presented.

There is no such thing as harmony among the wealth of judicial discussion on the specific question here presented. We are persuaded, however, that we reached the just and fair solution of the question upon the original hearing and that it is our duty to adhere to the conclusion there announced.

The extensive research and persuasive reasoning disclosed by the briefs on rehearing merit some further response from the court as to the merits of the contentions advanced.

The decision of this case rests upon the distinction between the discharge of governmental duties and the performance of proprietary or business engagements.

It is the duty of the county to take care of the "indigent sick and otherwise dependent poor." It might discharge that duty directly or by contract. It was not bound to build a county hospital,—the legislature did not so command. Building and operating a hospital was optional and discretionary with the county. The fact that it did build and now maintains a hospital does not render the care for the indigent sick and poor in such institution any less a public and governmental duty. Having built the hospital and furnished and opened it for the discharge of its public and governmental duty, it had the power to utilize any extra or excess facilities it possessed for serving other sick persons not indigent but able to pay for the service. In serving such persons, however, it was not engaged in the discharge of its public and governmental duty but was rather engaging to that extent in a private and proprietary business for pay and at once assumed the same relation to such persons as would any privately owned hospital sustain toward a patient entering it for hospital care. In the one case the public duty is imposed on the county as a governmental agency of the state to care for the indigent sick and poor of the county; in the other case no duty rests upon the county to care for those who are able to purchase their own care and attention. In the latter case the service and resultant duty is private and voluntarily assumed for pay; in the former it is not.

Taxes may be levied and collected for payment of the expenses of governmentally imposed obligations; that may not be done for a purely private purpose or business. (1 Cooley on Taxation, 4th ed., 381, sec. 174; 2 Dillon, Munic. Corp., 5th ed., sec. 884; *Atkinson v. Board of Commrs.*, 18 Ida. 282, 108 Pac. 1046, 28 L. R. A., N. S., 412; *School Dist. No. 8 v. Twin Falls etc. Co.*, 30 Ida. 400, 164 Pac. 1174; *City of Los Angeles v. Lewis*, 175 Cal. 777, 167 Pac. 390.)

It is urged that if such a rule be adopted as stated in the original opinion herein it may subject the counties maintaining hospitals and caring for pay patients to heavy damages and thus embarrass the counties financially. That might prove true but the remedy lies with the county. It may either carry insurance to secure it against such risks or refuse to accept such patients. (*Cohen v. General Hospital Soc.*, 113 Conn. 188, 154 Atl. 437.) There is clearly no way to compel the county to accept or render service to persons not "indigent sick or otherwise dependent poor."

It must be borne in mind that we are not here concerned with an issue as to whether the county could embark in the general business of building and operating hospitals for the care of persons able to pay, or whether the legislature would have the power to so authorize counties. Such has not been done and this case does not present such an issue, and for that reason we do not give further consideration to the specific constitutional questions so ably argued by counsel for respondent. Here the county was not and is not obliged to accept pay patients,—that is a matter of choice with the authorities.

The principle announced by this court some 30 years ago in *Eaton v. City of Weiser*, 12 Ida. 544, 86 Pac. 541, 118 Am. St. 225, with reference to the operation of an electric light system by a city is just as pertinent when applied to a county as it was there to a city, and that case has been the law of the state from the time it was decided down to the present time. No legislature has seen fit to alter or modify the law as there construed. It was there said:

"The city was engaged in a private enterprise, namely, that of manufacturing and selling electric light to its inhabitants. Such an engagement or enterprise is not one of the public governmental duties of municipalities. Municipal ownership in the usual and common acceptation of that term must of necessity carry with it the same duty, responsibility and liabilities that are imposed upon and attach to private owners of similar enterprises. If the city owns and operates an electric light system and sells light to its inhabitants, there is no reason why it should not be held to the same responsi-

bility for injuries received on account of its negligent conduct of the business as would a private individual be who might be running an opposition plant in the same municipality and selling light to the citizens thereof.''

It is not the intention of the court by the opinion in this case to depart in any respect from the rule announced in *Gorman v. Commrs. Boise County*, 1 Ida. 655, and *Worden v. Witt*, 4 Ida. 404, 39 Pac. 1114, 95 Am. St. 70, relative to governmental duties, and repeatedly cited and followed by this court in subsequent cases. The court is here dealing with a purely nongovernmental business transaction voluntarily assumed by the county.

We adhere to the conclusions reached on the original hearing and the judgment is accordingly reversed and the cause is remanded for further proceedings in harmony with the holding of this court. Costs to appellant.

Morgan and Holden, JJ., concur.

BUDGE, J., Dissenting.—Appellant alleges in her supplemental complaint that while she was a pay patient in the Twin Falls County General Hospital she received an injury caused by the negligence of employees of such hospital; that such hospital was erected and is maintained by the respondent pursuant to chapter 33, title 30, I. C. A., and that in accordance with the provisions of section 30–3303, I. C. A., respondent had provided for the acceptance of pay patients other than the indigent sick or otherwise dependent poor. Appellant prays for damages against Twin Falls County for her alleged injury. To the supplemental complaint respondent filed a general demurrer which was sustained. Appellant failed and refused to plead further and judgment of dismissal was entered, from which judgment this appeal is prosecuted.

Errors assigned are: First, that the court erred in sustaining the demurrer, and, second, in entering judgment.

The sole question here for determination is whether or not the supplemental complaint states a cause of action against respondent county.

The opinion on rehearing contains the following statement:

"There is no such thing as harmony among the wealth of judicial discussion on the specific question here presented."

The statement above quoted may be conceded to be correct if we look to all jurisdictions, but, confining ourselves to the decisions of our own court, there is no lack of harmony.

In *Davis v. State,* 30 Ida. 137, 144, 163 Pac. 373, 375, quoting from *Murdock Parlor Grate Co. v. Commonwealth,* 152 Mass. 28, 24 N. E. 854, 8 L. R. A. 399, the rule is established in this jurisdiction as follows:

"The law is well established that neither the state nor the United States is answerable in damages to an individual for an injury resulting from the alleged misconduct or negligence or tortious acts of its officers or agents."

It is likewise well settled in this jurisdiction that counties are but arms of the state; merely subdivisions of the state, created or superimposed by the sovereign power of the state of its own sovereign will, purely governmental creatures exercising a part of the sovereign power of the state. As was said in *Lewiston Orchards Irr. Dist. v. Gilmore,* 53 Ida. 377, 23 Pac. (2d) 720, quoting from *Strickfaden v. Greencreek Highway Dist.,* 42 Ida. 738, 248 Pac. 456, 49 A. L. R. 1057:

" 'Counties may be said to be true public corporations. They are local organizations, which for the purposes of civil administration are invested with a few functions characteristic of a corporate existence. They are legal political subdivisions of the state, created or superimposed by the sovereign power of the state of its own sovereign will, without any particular solicitation or consent of the people within the territory affected.' "

Being legal political subdivisions of the state,—arms of the state, created by the sovereign power of the state to carry out the sovereign will,—purely governmental creatures,—counties are subject to the same rule as that of the sovereign state of which they are a part, namely, that they are not answerable in damages to an individual for an injury resulting from the alleged misconduct, negligence or tortious act of an officer, employee or servant, in the absence of an express statute imposing liability. In *Strickfaden v. Greencreek High-*

*way Dist., supra,* the rule is clearly announced in the following language:

"It is well settled that in the absence of an express statute to that effect, the state is not liable for damages either for nonperformance of its powers or for their improper exercise by those charged with their execution. Counties are generally likewise relieved from liability, for the same reason. They are involuntary subdivisions or arms of the state through which the state operates for convenience in the performance of its functions. *In other words, the county is merely an agent of the state, and since the state cannot be sued without its consent, neither may the agent be sued.*"

In *Gorman v. Commrs. Boise County,* 1 Ida. 655, *Worden v. Witt,* 4 Ida. 404, 39 Pac. 1114, 95 Am. St. 70, *Davis v. Ada County,* 5 Ida. 126, 47 Pac. 93, 95 Am. St. 166, *Davis v. State,* 30 Ida. 137, 163 Pac. 373, Ann. Cas. 1918D, 911, *Youmans v. Thornton,* 31 Ida. 10, 168 Pac. 1141, and *Strickfaden v. Greencreek Highway Dist., supra,* the rule is announced that a county cannot be held liable for the tortious acts or negligence of its officers, employees or servants because of the fact that it is involuntarily created as an agency or arm of the state for the purpose of discharging duties of sovereignty in the administration of government. In *Gorman v. Commrs. Boise County, supra,* the following language is used:

"It is urged that the board of commissioners acted in violation of their duties in appointing Davis to the office, which legally belonged to appellant, and in doing so a wrong was committed by which he suffered injury. Conceding that their action was erroneous, and that appellant was wronged thereby, still the county cannot be made responsible for it. Counties are created *in invitum,* for certain political or governmental purposes. They are but parts of the machinery by which the affairs of the people are conducted, and they stand in the same relation to the agents which they are obliged to select in aid of the public services as the government of which they are parts, and can no more be held responsible for their acts than can the entire government. . . . . "

In *Davis v. Ada County, supra,* the rule was stated in the following manner:

"However, the decided weight of authority is that a county is not liable for a tort, unless expressly made so by statute. We have no such statutory provision. In section 963 of 2 Dillon on Municipal Corporations, the following language is used: 'According to the prevailing rule, counties are under no liability in respect to torts except as imposed (expressly or by implication) by statute. They are political divisions of the state, created for convenience, and are usually regarded not to be impliedly liable for damages suffered in consequence of neglect to repair a county road or bridge. Such a liability, unless declared by statute, is generally, but not universally, denied to exist.' "

Had there been any intention upon the part of the legislature to impose liability upon the county by reason of the carelessness, negligence or tortious acts of officers, employees or servants, in the erection, operation and maintenance of county hospitals it would have so stated in an unequivocal enactment. Not having said so, nor so enacted, there is no liability. From a careful examination of the decisions of this court from the first Idaho in the case of *Gorman v. Commrs. Boise County, supra,* as far back as 1877, the question of the liability of counties for torts, negligence and misconduct of employees, officers and servants has been settled, exempting them from liability in the absence of statute expressly imposing liability. This rule of law has been reiterated from time to time down to and including the decision in *Strickfaden v. Greencreek Highway District, supra,* in the forty-second Idaho, and has not been changed nor modified by legislative enactment, judicial decision or otherwise, until the announcement of a contrary rule in the instant case. There is no general statute imposing liability upon counties for the negligence, misconduct or tortious acts of their officers, employees or servants and the statute empowering counties to erect hospitals for the care, maintenance and treatment of the indigent sick or otherwise dependent poor, does not provide for nor create any liability against a county for negligence or the tortious acts of its employees.

The general proposition that a state cannot be sued without its consent is held by the overwhelming weight of author-

ity. (*Strickfaden v. Greencreek Highway Dist., supra; Davis v. State, supra.*) The cases uniformly hold, not only that states cannot be sued without their consent, but further, that even when by constitutional provision or legislative enactment the state has permitted itself to be sued, the mere fact of permitting suit does not render the state liable for the careless, negligent- or tortious acts of its servants, employees or agents, in the absence of any statute expressly fixing such liability upon the state. (*Davis v. State, supra.*) Counties likewise cannot be sued in the absence of a statute authorizing suit to be brought against the county.

In the opinion on rehearing it is suggested that the establishment of the county hospital was not mandatory and that:

"Building and operating a hospital was optional and discretionary with the county. . . . . Having built the hospital and furnished and opened it for the discharge of its public and governmental duty, it had the power to utilize any extra or excess facilities it possessed for serving other sick persons not indigent but able to pay for the service. In serving such persons, however, it was not engaged in the discharge of its public and governmental duty but was rather engaging to that extent in a private and proprietary business for pay and at once assumed the same relation to such persons as would any privately owned hospital sustain toward a patient entering it for hospital care."

It is the mandatory duty of county commissioners to suitably provide for the care, maintenance and medical treatment of the indigent sick or otherwise dependent poor either by the erection and maintenance of hospitals for that purpose or by contract, and in so doing they act in a governmental and not in a proprietary capacity. Governmental functions have been defined to be:

"Legal duties imposed by the state upon its creatures, which it may not omit with impunity but must perform at its peril. . . . . They are imposed by statute, and are necessarily mandatory or peremptory functions."

*Boise Development Co. v. Boise City*, 30 Ida. 675, 167 Pac. 1032; *Youmans v. Thornton, supra.*

The rule is well established in this state that counties cannot engage in nor become interested in private business. In *School District No. 8 v. Twin Falls, etc.*, 30 Ida. 400, 164 Pac. 1174, it is said:

"The sections of the constitution referred to are self-operative. They are intended to prevent any county . . . . from lending credit to or becoming interested in any private enterprise, or from using funds derived by taxation in aid of any private enterprise, . . . . "

Art. 4, sec. 12, Constitution.

Nor, may a county levy or collect taxes except for public purposes. (1 Dillon, Municipal Corporations, sec. 508; Cooley, Taxation, 2d ed., p. 55; 25 Am. & Eng. Ency. Law, p. 87, and notes cited in note 2 on said page.)

In the instant case the county was authorized to erect and maintain a county hospital for the care of the indigent sick and otherwise dependent poor. In so doing it acted in its governmental capacity. As was said in *Davis v. State, supra,* quoting *Riddoch v. State*, 68 Wash. 329, 123 Pac. 450, Ann. Cas. 1913E, 1033, 42 L. R. A., N. S., 251:

" 'On the other hand, the state is inherently sovereign at all times and in every capacity. It is the organized embodiment of the sovereign power of the whole people. By reason of this sovereignty, it possesses all powers, but only such powers as are within the limitations of the state constitution and without the prohibitions of the Federal constitution. It can do no act except in the exercise of this sovereign power and within these constitutional limitations. If it may constitutionally take over any enterprise, though usually of the nature of a private business, the very taking over is an exercise of this sovereign power. It seems much more logical and much more consonant with the idea and genius of sovereignty that the enterprise thus taken over should be impressed with the sovereign character of the state than that the state should become hampered by the private character of the enterprise. The latter result is incompatible with the concept of sovereignty.' "

The distinction between a true municipal corporation, such as a city, village or highway district, and a county, which is

purely an arm of the state is: The former is created by the voluntary act of the inhabitants within the territorial area and acts both in a governmental and a proprietary capacity, while the latter is an involuntary integral part of the sovereign state, and, as the state, exercises governmental powers only. Had Twin Falls County purchased the hospital which had been operated as a private business its acquisition by the county would have been an exercise of the sovereign power of the county and the business of the operation of the hospital would have become immediately impressed with its sovereign character.

In *McKay v. Washoe General Hospital,* 55 Nev. 336, 33 Pac. (2d) 755, 759, 36 Pac. (2d) 78, counsel conceded that a county, which is but a political subdivision of the state, could not be sued without legislative consent, but contended that the rule did not apply in a case almost identical to the one here under consideration, contending for a principle similar to that announced in the opinion on rehearing, that the establishment of defendant hospital was not mandatory and that the acceptance of the plaintiff as a patient and caring for her was discretionary and that no governmental function was involved in her care and treatment, and that hence the same rule of law should apply to defendants as applies to individuals or corporations operating a hospital for profit, citing in support of the contention a case involving a city hospital, *Bell v. City of Pittsburgh,* 297 Pa. 185, 146 Atl. 567, 64 A. L. R. 1542, which the court concluded to be not in point. In the opinion it was held that it was not the legislative intent to make such an institution liable in damages and furthermore that the failure of the legislature to provide that defendant might sue and be sued is a conclusive reason why the action could not be maintained. In the course of the opinion it is said:

''The liability of an organization created by statute must be determined under an interpretation of the statute creating it, and, though the defendant hospital was not created by a legislative act, it was organized pursuant to such an act, and we must look to the intention of the Legislature in

enacting the law authorizing the organization of defendant hospital in reaching a conclusion in this case.

"The act under which the defendant hospital was organized provided that 'any county may establish a public hospital in the following manner.' The act did not create a corporation, but merely authorized the respective counties to establish a hospital, and it did not provide that such hospital, might sue or be sued. All moneys raised by taxation pursuant to the act are collected as other taxes are collected, and must be credited to the 'Hospital Fund,' and 'shall be paid out on the order of the hospital trustees for the purposes authorized by this act, and for no other purposes whatever,' and the title to all property donated for the benefit of such hospital shall vest in the county.

"It seems to us that the intention of the Legislature is perfectly plain, namely, to set up a public institution which should own no property, have no income and no method of raising money, and hence no ability to pay anything. Certainly it was not the legislative intent to make such an institution liable in damages for any act done in carrying out the purposes sought to be attained.

"Furthermore, the failure of the Legislature to provide that the defendant might sue and be sued is a conclusive reason why this action cannot be maintained."

A careful reading of chapter 33, title 30, convinces me that the legislative authority therein granted to counties to erect or otherwise maintain hospitals for the care of the indigent sick and dependent poor did not contemplate that such hospitals should be operated for profit. The electors within the county in accepting the provisions of the act, burdening themselves by a bond issue and subjecting their property to the levy and collection of taxes to discharge the bonds and otherwise maintain the county hospital, did not understand, and neither did the legislature intend, that a liability would be created against the taxpayers for the tortious acts of officers, agents or employees of the county in operating the hospital. The fact that those in charge of the operation of the hospital exacted or received pay, in whole or in

part, from some of its patients would not render the county liable, and through the county the taxpayers within the county, for the tortious acts of the officers, employees or servants of the hospital. The purpose of the provision that "such hospital may suitably provide for and accept other patients in so far as their facilities will permit, and may charge and accept payments from such of their patients as are able to make payment for services rendered and care given" was intended to reimburse the county for any expenditures, which reimbursements were diverted into the county hospital fund, and, like other hospital funds, used for governmental purposes, namely, the operation of the hospital. Similar provisions are provided for in the operation of mental hospitals and homes for the feeble-minded in this state, patients cared for in such institutions who are able to pay in whole or in part being required to pay, and it could not be logically contended that the state would be liable for the tortious treatment by officers, agents and employees in such institutions, based solely upon the theory that they had accepted pay, which alone would create the liability.

In the opinion on rehearing it is conceded that only those who are designated as pay patients may recover because of the tortious acts of officers, employees or agents of the hospital, while an indigent sick or otherwise dependent poor person, however tortiously, negligently or carelessly treated, could not recover. Such an unwarranted discrimination was never in the mind of the legislature and cannot be gathered from the act above referred to.

Conceding for the purpose of argument that it might be desired that one maltreated in a county hospital should be compensated for the injuries sustained, that is a matter for the legislature and not for the courts.

In my opinion the action of the trial court in sustaining the demurrer and later dismissing the action was not erroneous, but in conformity with the principles of law heretofore promulgated by this court.

Givens, C. J., concurs in the conclusion reached in the dissent.