## Automobile Underwriters, Inc., v. City of Pittsburgh

*Seif, Evashwick & Best,* for plaintiff.

*William Alvah Stewart, Jr.,* city solicitor, and *John R. Bentley,* assistant city solicitor, for defendant.

SOFFEL, J., February 11, 1942.—This is an action in assumpsit tried by the court without a jury. The essential facts are admitted and the case is to be decided on a narrow question of law.

On October 30, 1934, at approximately 8:30 in the morning, William B. Hykes drove his automobile into the parking lot owned and maintained by the City of Pittsburgh on the Allegheny River wharf, between Seventh and Eighth Streets and Duquesne Way, in the City of Pittsburgh, Allegheny County, Pa. He paid the required parking fee, personally drove his car to the

place on the wharf indicated by an attendant, and at the direction of the latter left the ignition key in the car. He then went to his office in the Clark Building and returned for his car between six and seven o'clock in the evening. The attendant then in charge was unable to locate the car. It subsequently appeared that the car had been stolen. It was recovered some days later in a damaged condition. The cost of repairing the damage amounted to $186.13. This loss was paid by the plaintiff company which had insured Mr. Hykes against theft.

The policy of insurance provided, inter alia, as follows:

"Upon payment of any loss, the attorney shall be subrogated to the extent of such loss to all rights of recovery by the assured, and the assured shall fully cooperate with the attorney to secure to it such rights, it being understood that any amount recovered shall be applied pursuant to the stipulations, as set out in the subscriber's agreement and application heretofore signed by the assured. The attorney may take over and conduct in the name of the assured the prosecution or defense of any claim or suit for indemnity, damages or otherwise against third parties."

Exercising the right of subrogation as provided in said policy, the Automobile Underwriters, Inc., attorney-in-fact for the subscribers at the State Automobile Insurance Association, plaintiff, instituted suit in assumpsit against the City of Pittsburgh, defendant. Plaintiff's case is predicated upon the failure of defendant to exercise proper care and custody of the automobile of Hykes in accord with the requirements of the contract of bailment entered into when Hykes paid for parking space in the lot owned and operated by the City of Pittsburgh. While the instant action is assumpsit, it sounds in tort.

The sole question before the court is whether the City of Pittsburgh, in the operation of the parking lot,

was exercising a governmental function which exempted it from liability for torts or breach of duty on the part of its attendants, agents, and employes, or whether it was exercising a proprietary function. The question of law involved may be stated as follows:

"In maintaining and operating a parking lot upon property owned by it to which the public, upon payment of a fee, is invited to park automobiles, is the City of Pittsburgh exercising a governmental or proprietary function?"

Counsel for defendant contends that the instant case is ruled by the case of Kappel v. City of Pittsburgh, 77 Pitts. L. J. 218. In that case the City of Pittsburgh was held not liable in damages for an automobile stolen while parked on a public wharf maintained by the city and in charge of city employes, a fee having been paid for the privilege of parking. In deciding the Kappel case, Judge Miller of the County Court held that the maintenance of a parking station by the City of Pittsburgh involved the exercise of a governmental function. Finding no statutory authority which directly authorized the city to maintain parking stations and make charges therefor, Judge Miller held that the maintenance of the parking station was an exercise of police power under the Act of June 30, 1919, P. L. 678, sec. 28, and its amendments. At page 219 of the opinion, Judge Miller says:

"The wharf in question was improved and was under the control of the City, the same as its streets, and the City under the authority of said Act of Assembly [to wit, Act of June 30, 1919, P. L. 678, sec. 28, amended by the Act of April 27, 1925, P. L. 254] had a right to and did set it aside as a place for the parking of automobiles as a matter of convenience and for the safety of the public, and did so under its police power conferred upon it by said Act of Assembly."

A careful analysis of this opinion leads us to the conclusion that the decision was based primarily on the

absence of State legislative authority authorizing a municipality to maintain a parking station and make charges therefor. The absence of direct legislative authority led the trial judge to conclude that the authority must be found in exercise of police power under the act of assembly cited, supra. This is evidenced by the following expression of opinion (p. 220) :

"Another matter that was stressed by counsel for the plaintiff, that the city in maintaining the parking station on the wharf was acting in its business capacity and not as a governmental function, was because of the fact that a charge of ten cents was made by the officers in charge of the station for each automobile parked there. We might agree with counsel if there were state legislative authority authorizing the City to make such charge, but in the absence of such authority we conclude that said parking station was operated by the City under its police power."

With the conclusion as thus formulated we cannot agree: First, because in our judgment the act of assembly relied upon does not invest the city with the authority claimed for it by exercise of police power; and secondly, we must conclude that the parking of automobiles by a municipality, even though it may be a matter of convenience to its citizens, is not an exercise of police power.

"The rule is apodictical that the police power is limited to the promulgation and enforcement of measures reasonably demanded for the public health, morals, comfort, safety or general welfare of society. The extent to which this power will be carried in the advancement of the public welfare is not susceptible of precise determination, but it must be limited to the reasonable requirements, necessities or exigencies of each case": 3 McQuillan, Municipal Corporations 86, §945.

It is thus apparent that it is a basic principle of law that where a municipality presumes to act in exercise of its police power there must be clearly evidenced a

substantial and reasonable relation to the maintenance of health, morals, peace, safety, order, and the general welfare of the community.

In the case of Commonwealth v. Zasloff, 338 Pa. 457, 460, Mr. Justice Stern analyzes the Federal cases and the law of Pennsylvania that consider police power and expresses the law as follows:

"The police power, originally conceived as applying to the health, morals and safety of the people, has been juridically extended to many fields of social and economic welfare. We have become familiar with statutes fixing rates in the case of industries affected with a public interest; neither is there any novelty in legislation aimed to control prices where the object is to prevent monopoly. But in these, as in all cases, the police power is not unrestricted; its exercise, like that of other governmental powers, is subject to constitutional limitations and judicial review, otherwise we would have an absolute instead of a constitutional scheme of government. It has frequently been stated by federal and state courts alike that a law which purports to be an exercise of the police power must not be arbitrary, unreasonable or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the object sought to be attained: *Mugler v. Kansas*, 123 U. S. 623, 661; *Chicago, Burlington & Quincy Railway Co. v. Drainage Commissioners*, 200 U. S. 561, 593; *Nebbia v. New York*, 291 U. S. 502, 525, 537, 539; *Mahon v. Pennsylvania Coal Co.*, 274 Pa. 489, 497; *White's Appeal*, 287 Pa. 259, 265; *Breinig v. Allegheny County*, 332 Pa. 474, 483."

We, therefore, are constrained to conclude that the maintenance of a public parking station is, in no sense of the word, an exercise of police power under the law as cited. The instant case therefore is not ruled by the Kappel case.

This brings us to the question of whether the maintenance of a public parking station on a wharf controlled by the city and where a fee is paid for the privilege of parking is to be construed as the exercise of a governmental or proprietary function.

"These rules concerning municipal liability for negligence relating to corporate duties, and nonliability for negligence in regard to governmental duties, are elementary. The only difficulty is in their application, because often it is not easy to determine in a particular case whether the duty involved is a governmental or corporate one, *i. e.*, whether the injury complained of is the result of the failure to exercise or the negligent exercise of a governmental and public power, or is due to negligence in the exercise or performance of a corporate ministerial and private power or duty. . . . 'The difficulty lies not in the statement of the governing principles of law, but in their application to particular facts. The underlying test is whether the act is for the common good of all without the element of special corporate benefit, or, pecuniary profit. If it is, there is no liability, if it is not, there is liability.' 'The true test does not rest upon the determination as to whether or not the municipality is reaping a momentary [sic] gain.' 'The liability or nonliability of a municipality for its torts does not depend upon the nature of the tort, the relation existing between the city and the person injured, or whether the city was engaged in the management of tangible property, but depends upon the capacity, in which the city was acting at the time.' 'It is not the character or name of the agent who executes the duty of removing the cause of discomfort and ill health to the public which fixes the character of the duty performed, but it is the act itself which determines whether it is governmental or ministerial.'

"What are governmental powers and duties, and what are corporate duties, is not subject to precise definition further than to say this: The powers and duties

of municipal corporations are of two-fold character; the one public as regards the state at large, in so far as they are its agents in government; the other private in so far as they provide the local necessities and conveniences of their own citizens. A municipal corporation 'possesses two kinds of powers: one governmental and public, and to the extent they are held and exercised, is clothed with sovereignty; the other private, and to the extent they are held and exercised, is a legal individual. The former are given and used for public purposes; the latter for private purposes. While in the exercise of the former the corporation is a municipal government, and while in the exercise of the latter is a corporate legal individual' ": 6 McQuillan on Municipal Corporations (2nd ed.) 1056, §2795.

In the case of Scibilia v. City of Philadelphia, 82 Pa. Superior Ct. 328, in distinguishing between the public duties of a municipality when acting in a governmental capacity and the exercise of its private duties, the court said (p. 333):

"We think the true test is whether the duty is public and governmental or private and corporate. As characteristic examples of public or governmental functions we have the case of . . . municipal water supply or lighting plants furnishing conveniences to the inhabitants for compensation. But municipalities have been held liable in many cases where the commercial nature of the business is lacking. A municipal corporation is not liable merely because it derives an income from a purely governmental work if the income is purely incidental to the main purpose of the work. If the function undertaken is commercial in its nature, the corporation is not exonerated from liability by the fact that its operations are not or cannot be profitable." See 19 R. C. L., Municipal Corporations, §392. See also 43 C. J. 203, §§200, 201, 202 et seq.

Analyzing the principles as stated, we are of the opinion that the furnishing of parking space by a mu-

nicipality in return for the payment of a fee is in its essence a commercial and private venture. We believe no distinction should be made between the owners and proprietors of private parking lots and garages who are liable both for breach of contracts and torts of their servants, agents, and employes, and a municipality when it "embarks in an industrial enterprise through corporate form," for in so doing it "places its name and its sovereign position on the same plane as that of any other stock company or dealer in a similar commodity": Bell et ux. v. Pittsburgh et al., 297 Pa. 185, 190.

The tendency today is to hold the municipality liable for acts or omissions on the part of servants and employes which formerly were excused. For example, section 212 of The Vehicle Code of May 1, 1929, P. L. 905, art. VI, sec. 619, as amended by the Act of June 22, 1931, P. L. 815, and the Act of June 29, 1937, P. L. 2329, holds a county, city, borough, incorporated town or township, employing any person, jointly and severally liable with such person for any damages caused by the negligence of such person while operating a motor vehicle or fire department equipment upon a highway in the course of his employment: Devers v. Scranton City, 308 Pa. 13; Mallinger v. Pittsburgh, 316 Pa. 257; Cavey, to use, v. Bethlehem, 331 Pa. 556; Mooney v. Philadelphia, 115 Pa. Superior Ct. 433.

We, therefore, conclude that the City of Pittsburgh in the maintenance of the parking station on the wharf is engaged in the exercise of a proprietary function and is therefore liable for the acts or omissions of its servants, agents, and employes. Judgment in the instant case must be entered in favor of plaintiff and against the City of Pittsburgh in the sum of $186.13.

*Order of court*

And now, to wit, February 11, 1942, judgment is entered in favor of plaintiff, Automobile Underwriters,

Inc., attorney-in-fact for the subscribers at the State Automobile Insurance Association, and against defendant, City of Pittsburgh, in the sum of $186.13.